STATE of Missouri, Plaintiff–
Respondent,

v.

Cody Gaylene PARSONS, Defendant–
Appellant.

No. SD 30351.

Missouri Court of Appeals,
Southern District,
Division One.

April 11, 2011.

Kent Denzel, Columbia, MO, for appellant.

Chris Koster, Attorney General, and
Evan J. Buchheim, Assistant Attorney

appeal, which were taken with the case.

General, Jefferson City, MO, for respondent.

DON E. BURRELL, Judge.

Cody G. Parsons ("Defendant") was originally charged with one count each of forcible rape and forcible sodomy for conduct occurring on or about September 20, 2007. *See* sections 566.030 and 566.060.[1] The case was tried to a jury in October 2009. After the close of the State's evidence, the prosecutor also filed against Defendant for the same conduct the lesser-included offenses of attempted forcible rape and attempted forcible sodomy. *See* section 564.011.1 [2] The jury found Defendant not guilty of all charges except the lesser-included charge of attempted forcible rape. Defendant was thereafter sentenced to serve a seven-year term of imprisonment for that offense.

Defendant now appeals his conviction, asserting in one point relied on that the trial court committed plain error by submitting a verdict director for attempted forcible rape that "did not specify the conduct that constituted the alleged substantial step, or whether that alleged conduct occurred in the bedroom or the bathroom; therefore it cannot be said, due to [A.P.'s ("Victim")] conflicting statements, that all members of the jury found that the same conduct from the same alleged incident

constituted a substantial step toward forcible rape."

Because this claim is different from the objection Defendant raised at trial, Defendant requests plain error review under Rule 30.20.[3] Although we do find that the trial court erred by submitting the jury instruction now challenged by Defendant, that error was not "evident, obvious and clear" and did not result in a manifest injustice or miscarriage of justice. *See State v. Darden*, 263 S.W.3d 760, 762–63 (Mo.App. W.D.2008). For that reason, we affirm Defendant's conviction.

**Factual and Procedural Background**

The facts and reasonable inferences to be drawn from them are presented here as viewed in the light most favorable to the jury's verdict. *State v. Baldwin*, 290 S.W.3d 139, 143 (Mo.App. W.D.2009). Defendant and Victim were husband and wife. From October 2006, they lived together with Victim's four children. By September 2007, the marriage was "[v]ery rocky." On September 19, 2007, Victim told Defendant that "he had to leave in two weeks because [she] wanted a divorce." That night, Victim put her children to bed and then went to bed herself. Victim testified she was awakened when Defendant began fondling her breasts and was attempting to kiss her. Victim told Defen-

---

1. All statutory references are to RSMo 2000 unless otherwise stated. Amendments to section 566.030 made in 2006 and 2009 are not relevant to this appeal. Under section 566.030.1, "[a] person commits the crime of forcible rape if such person has sexual intercourse with another person by the use of forcible compulsion." "A person commits the crime of forcible sodomy if such person has deviate sexual intercourse with another person by the use of forcible compulsion." Section 566.060.

2. Although the actual request by the State to submit the lesser included offense of attempt-

ed forcible rape is not included in the transcript filed on appeal, the legal file reflects the filing and the trial court noted on the record that the request was made "after the evidence was closed." Under section 564.011.1, "[a] person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step toward the commission of the offense."

3. Unless otherwise indicated, all rule references are to Missouri Court Rules (2010).

dant that she did not want to have sex with him.

Despite Victim's statement, Defendant "kept pushing himself on [her]" and said, "here's the deal, you can keep the house and I can have sex with you for the next two weeks."[4] Victim told Defendant, "[N]o." Defendant then got on top of Victim, pulled down her underwear, and "started having sex with [her]. [She] was able to stop him though." Victim was able to push Defendant away, but she did not really know why he stopped having sex with her. Victim testified that Defendant had an erection, and his penis penetrated her vagina, but she did not know if he ejaculated. Defendant then went into the living room and "went back to playing video games and watching TV."

Victim took a bath, then re-dressed in the same nightgown and underwear she had been wearing before taking her bath. At this point, Victim was crying and thinking about how she could get her children out of the house. Defendant came into the bathroom after Victim had bathed and put her underwear and nightgown back on. Defendant put Victim "up on the bathroom cabinet [countertop] and he told [her] [she] was going to have—that he was going to have sex with [her]. And [she] told him, 'No.' " Defendant ripped Victim's underwear as he pulled them from underneath her. While Defendant was then "[h]aving sex" with her, she kept telling Defendant no and begging him to stop. Defendant had an erection, but Victim again did not know if he ejaculated.

Victim got down from the bathroom countertop and went into the bedroom. Defendant followed. When Victim got back into bed, Defendant straddled her, telling her that she was going to give him

oral sex. Defendant put his penis in Victim's mouth and then asked her if she "couldn't do any better than that." Victim said, "I started to yell, and [Defendant] put his hands around my throat. And he started to squeeze, and he said if you scream I'm going to wake up the boys. So I stopped and I didn't do anything. I didn't want my children to see that."

After the oral sex, "[Defendant] got up and he was sitting on the floor and he was telling [Victim] that he was sorry and that he loved [her] so much, but if [she] didn't want to be with him that it wasn't worth it." Victim testified that after Defendant had assaulted her in the bathroom, he began making statements about stabbing himself. Defendant told Victim to slap him to make herself feel better. When Victim refused, Defendant said he would stab himself if she did not slap him. Defendant then stabbed himself above his knee with a pocket knife. Victim said, "And [Defendant] kept insisting that if I didn't slap him every time he counted to— he would count to 10. Every time I didn't slap him then he would stab himself." Eventually, Victim did slap Defendant, but she also thought he may have stabbed himself yet again, this time with a kitchen knife. Victim begged Defendant to let her get the children out of the house. Defendant "finally agreed to that and he went to the garage."

When Defendant went into the garage, Victim went upstairs, woke up the children, and "told them to get ready for school[]" even though it was still dark outside. Victim put the children in one bedroom and told them to stay there. Victim was afraid to take them downstairs because she did not know if Defendant was

---

4. From the context in which the remark was made, we presume that Defendant meant that he would agree to allow Victim to receive their house as a marital asset in the anticipated dissolution case.

back inside the house. Earlier in the night, Victim had discovered that the phone lines to their home had been cut. Victim went downstairs and looked through a window in the garage door. When she looked, she saw Defendant "hanging" with "[h]is feet [ ] tangled up in a chair." She tried opening the screen door into the garage, but it was locked. Victim ran to the neighbor's house and beat on their door, telling the husband and wife who lived there that Defendant "was hanging in the garage." The husband ran to the garage and his wife called 9–1–1.

Barry County Sheriff's Deputy Russell Nichols testified that he responded to Defendant's residence about 5:10 a.m. and found Defendant lying on the floor of the garage, breathing, but unresponsive. The neighbor who initially rescued Defendant was still in the garage with him, and Victim was inside the house. A chair and a length of rope were found near Defendant. Ambulance personnel transported Defendant to the hospital. Deputy Nichols interviewed Victim and had her produce a written statement. Deputy Nichols also prepared his own written report of the incident. Deputy Nichols did not notice any bleeding on Defendant.[5]

Deputy Nichols testified that neither his report nor Victim's written statement contained any allegations that sexual intercourse had occurred when Defendant first woke Victim in the bedroom or that Defendant had forced Victim to give him oral sex. Both Deputy Nichols's report and Victim's written statement indicated that Defendant had attempted to have sexual intercourse with Victim in the bathroom but that he stopped before any penetration had occurred.

Later that morning, Victim's mother and father took Victim to the hospital for an examination. The nurse who performed the forensic examination of Victim testified that her report indicated that Victim told her that both vaginal penetration and oral copulation had occurred. Forensic testing revealed a stain of Defendant's semen on Victim's ripped underwear. Forensic testing also indicated the presence of human blood on the tip of a pocket knife seized from Defendant's residence.

After the close of all the evidence, an initial instruction conference was held. Defendant objected to proposed Instruction No. 9, the State's verdict director for attempted forcible rape. Defendant's objection at that time was that the lesser included offense was not filed until after the close of the State's evidence and that there was not "any evidence where [sic] a jury could make that finding that it was [an] attempt[.]"

Before recessing for the evening, the trial court indicated that it would give the instruction on attempted forcible rape as set forth in Instruction No. 9 and would take up any converse instruction from Defendant "first thing in the morning." During the next morning's conference, the trial court announced that Instruction No. 9 had "been revised based on [MAI–CR 3d] 304.07."[6] In its final form, Instruction No. 9 provided:

5. A paramedic who arrived on scene testified that he also did not notice any wounds to Defendant's arms and legs.

6. Unless otherwise stated, all references are to MAI–CR 3d (1–1–05). The first paragraph of Instruction No. 9 does not appear in pattern instruction MAI–CR 3d 304.07, although it is included in MAI–CR 3d 304.06. If the attempt is punishable under section 564.011 RSMo, then Instruction 304.06 is to be used and Instruction 304.07 is intended when the attempt is not punishable under that statute. *See* Note 1 for both MAI–CR 3d 304.6 and 304.07. Section 566.030.2 provides for punishment of attempted forcible rape. MAI–CR 3d 304.7 reads:

If you do not find the defendant guilty under Count I of forcible rape, you must consider whether he is guilty of an attempt to commit forcible rape.

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about September 20, 2007, in the County of Barry, State of Missouri, the defendant tried to have sexual intercourse with [Victim],

Second, that the defendant did so by the use of forcible compulsion, and

Third, that such conduct was a substantial step toward the commission of the offense of forcible rape, and

Fourth, that defendant engaged in such conduct for the purpose of committing such forcible rape,

then you find the defendant guilty under Count I of an attempt to commit forcible rape.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

A person commits the crime of forcible rape when he knowingly has sexual intercourse with another by the use of forcible compulsion.

As used in this instruction, the term "forcible compulsion" means physical force that overcomes reasonable resistance.

As used in this instruction, the term "substantial step" means conduct that is strongly corroborative of the firmness of the defendant's purpose to complete the commission of the offense of forcible rape.

Defendant tendered a converse instruction as proposed Instruction No. 10, but also stated, "Judge, even in light of the new instructions I just renew the objections that I filed yesterday. The reasons haven't changed, just the wording." Defendant's proffered converse instruction used the same "tried" language used by the State, stating:

If you have a reasonable doubt as to whether

First, the defendant tried to have sexual intercourse with [Victim],

or

Second, the defendant used forcible compulsion,

(As to Count, if _____) (If) you find and believe from the evidence beyond a reasonable doubt:
First, that (on) (on or about) [*date*], in the (City) (County) of _____, State of Missouri, the defendant [*Describe the conduct that would constitute the attempt. Do not use the word "attempt." See Notes on Use 2.*], and
Second, that such conduct was a substantial step toward the commission of the offense of [*name of offense with sufficient details to identify person or property involved, e.g., "escape from Boone County Jail "*], and
Third, that defendant engaged in such conduct for the purpose of committing such [*name of offense*], then you will find the defendant guilty (under Count _____) of an attempt to commit [*name of offense*].

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.
A person commits the crime of [*name of crime*] when he [*Insert definition of crime including all elements thereof. Do not use the attempt language in the statute. See Notes on Use 3.*]
As used in this instruction, the term "substantial step" means conduct that is strongly corroborative of the firmness of the defendant's purpose to complete the commission of the offense of [*name of offense*]. (It is no defense that is [sic] was factually or legally impossible to commit [*name of offense*] if such offense could have been committed had the circumstances been as the defendant believed them to be.)

you must find the defendant not guilty under Count I of forcible rape [7] as submitted in Instruction No. 9.

The trial court implicitly overruled the objections by stating, "All right. Well, that [sic] will be the instructions of the [trial] [c]ourt."

After the trial court instructed the jury and the parties presented their closing arguments, the jury completed its deliberation and returned to the courtroom with its verdicts. The guilty verdict form signed by the foreperson referenced Instruction No. 5—the verdict director for the forcible rape charge—not Instruction No. 9—the verdict director for the attempted forcible rape charge. No objection to the form of the verdict was made by Defendant. Although the trial court read aloud the reference to Instruction No. 5 as it recited the jury's verdicts, the erroneous reference was apparently not noticed until after the jury had been excused. When the trial court brought the error to the attention of the parties and offered to summon the jury to reappear, Defendant made no response, and the verdict was accepted by the court.

In his motion for new trial, Defendant alleged there was "no clear verdict" because the verdict of not guilty of forcible rape and the verdict of guilty of attempted forcible rape both referenced Instruction No. 5. The trial court denied the motion for new trial, and this appeal timely followed.

## Analysis

### Standard of Review

Defendant acknowledges that neither his trial objection to Instruction No. 9 nor his motion for new trial asserted what he now claims on appeal—that the verdict director for attempted forcible rape (Instruction No. 9) failed to describe sufficiently the conduct alleged to "constitute[ ] a substantial step toward forcible rape." As a result, Defendant acknowledges that his claim was not preserved for regular appellate review and requests Rule 30.20 plain error review. "For instructional error to rise to the level of plain error, the trial court must have so misdirected or failed to instruct the jury that it is apparent to the appellate court that the instructional error affected the jury's verdict." *State v. Thomas*, 75 S.W.3d 788, 791 (Mo. App. E.D.2002).

The State responds that Defendant did not comply with Rule 28.03, which provides that no error can be alleged in the giving of an instruction unless the party makes a distinct objection with grounds and raises the same objection in a motion for new trial. The State also asserts that "[t]his Court may find that Defendant waived [his] right [to] plain-error review because he failed to object to these instructions at trial on the same ground he asserts now for the first time on appeal." While the State correctly cites the provisions of Rule 28.03, the State's waiver argument has previously been rejected by our supreme court.

Although the state is correct that appellant waived appellate review when counsel failed to raise a specific objection to the disputed attempt instruction, it misconstrues the extent of the waiver. Unpreserved claims of plain error may still

---

7. The converse erroneously referred to the crime of "forcible rape" instead of to "attempted forcible rape." Defendant's converse instruction was otherwise patterned after MAI–CR 3d 308.02 (9–1–01). This instruction must be given if Defendant re-quests it, but the Notes on Use, Note 4(E) advises that "[i]f the defendant wishes to converse more than one paragraph of the verdict director, the converse should use numbered paragraphs in the same manner as a verdict director[.]"

be reviewed under Rule 30.20 if manifest injustice would otherwise occur. To be sure, there is some confusion regarding the interplay between Rule 30.20 and Rule 28.03. *State v. Bradshaw,* 26 S.W.3d 461 (Mo.App.2000), a Western District case, interpreted *State v. Martindale*[ 945 S.W.2d 669 (Mo.App. E.D. 1997) ] as disallowing all review, including plain-error review, in the absence of a timely objection. But, in fact, there is no case, not even *Martindale* itself, holding that Rule 28.03 trumps Rule 30.20.

*State v. Wurtzberger,* 40 S.W.3d 893, 898 (Mo. banc 2001). *See also State v. Cooper,* 215 S.W.3d 123, 125 (Mo. banc 2007) (claim of erroneous first-degree burglary verdict director was reviewed for plain error where defendant failed to comply with Rule 28.03), and *State v. Beck,* 167 S.W.3d 767, 777 (Mo.App. W.D.2005) (defendant did not waive plain error review of mandated but improper instruction that defendant himself submitted). Thus, Defendant has not waived plain error review and we exercise our discretion to consider his claim. *See State v. Hall,* 321 S.W.3d 453, 457 (Mo.App. S.D.2010) ("Our review of jury instructions for plain error is discretionary").

 Plain error review is a two-step process. "First, the appellate court must determine whether the trial court committed an obvious error, which affected the appellant's substantial rights. Second, if error is found in the first step," we must determine whether that error resulted in a manifest injustice or miscarriage of justice. *State v. Horton,* 325 S.W.3d 474, 477 (Mo. App. E.D.2010) (citations omitted). In other words, "[t]o establish that the instruction constitutes plain error, Appellant must show that the trial court misdirected or failed to instruct the jury and that it is evident that the instructional error affect-

ed the jury's verdict." *State v. Fitzpatrick,* 193 S.W.3d 280, 292 (Mo.App. W.D.2006). "Instructional error, even if clear and obvious, is rarely found to result in manifest injustice or a miscarriage of justice, requiring reversal for plain error." *State v. January,* 176 S.W.3d 187, 193 (Mo.App. W.D.2005).

### *Lack of Specificity of Conduct Alleged to Constitute a Substantial Step*

Defendant's point asserts that Instruction No. 9 was plainly erroneous because it "did not specify the conduct that constituted the alleged substantial step, or whether that alleged conduct occurred in the bedroom or the bathroom[.]"

As implicitly recognized in the fact that Defendant has divided his argument into two distinct sections, his single point inappropriately attempts to assert two different claims of error. The first section, entitled "Instruction No. 9 Should Have Specified Which Incident Was the Alleged Crime[,]" argues that the instruction provided "no way for the jury to know of which alleged attempted forcible rape it was being asked to find [Defendant] guilty—the in [sic] the bedroom or the one in the bathroom." The second, entitled "The Law Requires More Than 'Tried' as a Substantial Step[,]" is itself further divided into two distinct challenges. The first insists that the example provided in MAI–CR 3d 304.07 Note 4 of "tried to have sexual intercourse with Susan Doe" "creates a conflict with the substantive law because the *body* of MAI–CR 3d 304.07 states that in describing the conduct constituting a substantial step, the word 'attempt' is not to be used[,]" and "tried" is simply a synonym for "attempted." (Emphasis as stated in original). The second asserts that "[t]he court should have required the State to allege a *specific* substantial step that it claimed was 'strongly

corroborative of the firmness of [Defendant]'s purpose to complete the commission of the offense'" (quoting section 564.011.1) (emphasis as stated in original). We will address Defendant's second set of arguments first.

The State points out that Defendant's contention regarding "tried to" being an impermissible synonym for "attempt" is not included in his point relied on. We agree. Rule 84.04(e) provides that "[t]he argument shall be limited to those errors included in the 'Points Relied On.'" And "[i]ssues that are reflected only in the argument section of the brief are not presented for appellate review." *State v. Nibarger*, 304 S.W.3d 199, 205 n. 5 (Mo.App. W.D.2009) (argument challenging sufficiency of evidence on particular issue not reviewed because it was not included in point relied on). As a result, Defendant failed to properly preserve his argument that "tried" should not have been used in Instruction No. 9 because it is simply a synonym for the prohibited word "attempt."

The alternate portion of Defendant's second section argument—that the instruction did not identify the specific conduct the State alleged to be a substantial step toward the commission of forcible rape—was included in his point relied on and will be addressed. Defendant concedes that Note 4 of the Notes on Use for MAI–CR 3d 304.07 "gives as an example the very language of which he complains" but argues that "[w]here the substantive law conflicts with MAI–CR 3d and its Notes on Use, the substantive law controls[,]" noting that our supreme court "has held that

MAI–CR and its Notes on Use are 'not binding' to the extent they conflict with the substantive law." *State v. Carson*, 941 S.W.2d 518, 520 (Mo. banc 1997). Defendant's contention is very similar to one we rejected in *State v. Hudson*, 970 S.W.2d 855, 860 (Mo.App. S.D.1998).

*Hudson* was also an attempted forcible rape case, and the first element of the challenged verdict director stated that on the relevant date "the *defendant tried to have sexual intercourse with [the Victim][.]*" *Id.* (bold and italic text retained as in original). Hudson argued that "[tried to have sexual intercourse with the victim] failed to describe the conduct that constituted the attempt to rape [and] that the instruction 'allowed [the jury] to make [its] own determination as to what constituted attempted rape.'" *Id.* The *Hudson* instruction was patterned after MAI–CR 3d 304.06 (1–1–87).[8] *Id.* In affirming the defendant's conviction under plain error review, we pointed out that the language followed exactly an example set forth in the Notes on Use. *Id.* at 860–61. *See also State v. Heslop*, 842 S.W.2d 72, 76–77 (Mo. banc 1992) (general language of instruction stating "tried to steal a motor vehicle from the property of Auto Convoy Company[ ]" was permissible for inchoate crime of attempted stealing).

In addition to the example given in Note 4, "[i]mplicit in the use of approved pattern instructions like MAI–CR is the notion that they should be simple, brief, and submit ultimate issues rather than detailed evidentiary facts." *State v. Wood*, 668 S.W.2d 172, 174 (Mo.App. E.D.1984).[9] In

---

**8.** Instruction 304.07 was added in the 9–1–01 revisions to MAI–CR 3d 304.07. The *Hudson* court noted that this language was also in the 10–1–95 version of the Notes on Use, but was not included in the 7–1–97 version. *Id.* at 861 n. 3. The language returned in Note 2 of

the 9–1–99 revision and remained in revisions dated 9–1–01, 1–1–05, and 1–1–11.

**9.** *Accord*, MAI–CR, *"How to Use this Book,"* p.III (3rd ed.2008) ("If no MAI–CR 3d instruction is applicable, or if an existing MAI–CR 3d instruction must be modified, the new

light of the fact that (1) the official note on use for MAI–CR 3d 304.07 urges the drafter to use the exact language the trial court used here; (2) that *Hudson* found no plain error in the use of the same language challenged here; and (3) that drafters of instructions are generally admonished to avoid evidentiary detail, we cannot say that the use of "tried to have sexual intercourse with [Victim]" is "evident, obvious and clear" error—the high hurdle Defendant must clear before being entitled to plain error relief.

■ We now return to Defendant's first argument and consider whether more was required of the instruction in this particular case. In other words, did the general language used in Instruction No. 9 make it impossible to determine whether the jury's decision was unanimous as to whether the substantial step toward forcible rape "occurred in the bedroom or the bathroom" (hereafter referred to as "unanimity error"). In support of his unanimity error argument, Defendant relies on cases where the alleged conduct was submitted in the disjunctive.

In *State v. Oswald,* 306 S.W.2d 559 (Mo. banc 1957), the defendant was convicted of sodomy. *Id.* at 563. The verdict director authorized a finding of guilt if the jury found that defendant placed his genital organ into the victim's mouth, rectum, or both. *Id.* In reversing the defendant's conviction, our high court stated that "[i]t cannot be determined that there was a concurrence of twelve jurors upon one definite charge of crime." *Id.* Defendant also

cites two related cases, *State v. Washington,* 242 Mo. 401, 146 S.W. 1164, 1166 (1912), and *State v. Jackson,* 242 Mo. 410, 146 S.W. 1166, 1168–69 (1912), as examples of cases in which instructions erroneously permitted findings of guilt on the offense of keeping gambling devices based upon maintaining a craps table, a poker table, or both.

In *Jackson,* the Court summarized its reason for reversal as follows:

> The setting up and keeping of either table was an offense, and it cannot be determined from this record which of the tables charged the defendant was found guilty of setting up and keeping. The defendant is entitled to a concurrence of the minds of the 12 jurors upon one definite charge of crime, and the verdict must be definite and responsive to such charge.

*Id.* at 1168–69.[10]

Although Instruction No. 9 made no alternative statements as to Defendant's alleged conduct, Defendant argues that the preceding cases addressing disjunctive submissions apply by analogy because a unanimous basis for the jury's verdict is unclear in either situation. Defendant also calls attention to the language in *State v. Marks,* 721 S.W.2d 51 (Mo.App. W.D. 1986), "that the jury must agree on 'just what [the] defendant did[.]'" *Id.* at 54 (quoting *United States v. Gipson,* 553 F.2d 453, 457 (5th Cir.1977)).

But *Marks* also explained that while it was error to make a disjunctive submission on the "gravamen of the offense" in *Os-*

---

or modified instruction should not contain detailed evidentiary facts").

**10.** The State also acknowledges *State v. Pope,* 733 S.W.2d 811 (Mo.App. W.D.1987), a case not decided based upon plain error review in which trial convictions were reversed even though the two counts charged specific conduct because the verdict directors did not

specify the type of sodomy at issue and there was evidence of uncharged, other conduct that could have met the definition for sodomy. *Id.* at 813. The Western District stated in *Pope* that "[a]n instruction which allows [the jury] to convict of that act or another which is not charged cannot stand." *Id.*

*wald, Washington* and *Jackson,* it was not error to submit alternative means of the committing the offense of fraudulent appropriation of money by Marks. 721 S.W.2d at 54. The instruction that withstood appellate scrutiny in *Marks* asked the jury to determine whether "the defendant had appropriated $150 or more from [the victim] by means of falsely promising to prevent [victim's wife] from dying during childbirth *or* falsely promising to cure [victim's wife] of stomach cramps *or* falsely promising to remove evil curses from the lives of [victim and his wife]." *Id.* at 53–54 (italics in original). "Simply put, the jurors were not required to agree upon any particular promise among the three which appellant is charged with having made." *Id.* at 54. The Western District found this permissible because the alternate promises were no more than differing means of committing the same, single offense. *Id. See also State v. Merrick,* 257 S.W.3d 676, 681–83 (Mo.App. S.D.2008) (alternative language in the verdict director as to the means of committing first degree robbery was not error because the jury did not have to be unanimous as to the means of the offense).[11]

Thus, the question in Defendant's case is whether evidence that he tried to rape Victim in different rooms of their house simply described differing means of committing one basic offense or constituted evidence of separate offenses. Our research has failed to reveal a single Missouri case finding a unanimity error in a verdict director that generally described a single attempted forcible rape when the evidence adduced at trial suggested multiple attempted forcible rapes of a single victim.

While it is certainly possible for multiple steps to be involved in a single attempt to commit rape, *cf. State v. Young,* 139 S.W.3d 194, 197–98 (Mo.App. W.D.2004) (defendant's multiple acts of communicating via e-mail over several days with an undercover officer and one trip to meet the "girl" were sufficient for one charge of attempted statutory rape), the evidence here demonstrated that Defendant's attempt at forcible rape was repeated anew and was not simply a continuous series of steps toward committing a single rape. *Cf. State v. Wadsworth,* 203 S.W.3d 825, 831, 834 (Mo.App. S.D.2006) (defendant's conviction of seven counts of attempted enticement of a child affirmed where defendant traveled only once for a meeting with the person he believed to be a child but "separate [online chat] communications and inducements undertaken by defendant to attempt to entice ["victim"] to engage in sexual conduct were separate acts that constituted separate offenses[ ]").

The evidence adduced in the instant case suggested that Defendant intended to force sexual intercourse on Victim on at least two separate occasions—once in the bedroom and once in the bathroom. Defendant offered to give Victim the house in the upcoming divorce in exchange for "sex with [Victim] for the next two weeks." After the incident Victim described as having occurred in the bedroom, Defendant left the bedroom and watched television and played video games. During that in-

11. The State cites several cases where the verdict directors for multiple counts of the same type of offense were submitted against defendants. *See State v. Smith,* 32 S.W.3d 134, 136 (Mo.App. E.D.2000); *State v. Staples,* 908 S.W.2d 189, 190–91 (Mo.App. E.D.1995); *State v. Rudd,* 759 S.W.2d 625, 630 (Mo.App. S.D.1988); and *State v. Burch,* 740 S.W.2d 293, 295 (Mo.App. E.D.1987). Except insofar as they may be helpful in understanding prejudice resulting in manifest injustice or a miscarriage of justice, these cases are distinguishable from Defendant's case because nothing in Defendant's instructions specifically indicated that the jury was to consider multiple instances of the same type of offense.

tervening period of time, Victim was able to leave the bedroom, go into the bathroom, take a bath, and re-dress in her nightgown and underwear before Defendant then accosted her in the bathroom.[12] As a result, the trial court erred by submitting Instruction No. 9 because it failed to identify which of these separate incidents the jury was being asked to unanimously find constituted "tr[ying] to have sexual intercourse with [Victim]."

Because Defendant points us to no Missouri case that has addressed this particular issue and Defendant's argument is by analogy to distinguishable cases in which disjunctive submissions were involved, we would hesitate to describe the trial court's error here as "evident, obvious and clear." *Darden*, 263 S.W.3d at 762–63. In any event, Defendant cannot prevail as we find the error did not result in a manifest injustice or miscarriage of justice.

In *State v. Mackey*, 822 S.W.2d 933, 936 (Mo.App. E.D.1991), the Eastern District considered in the context of plain error review an instruction similar to the one that led to a reversal in *Oswald*—a case in which the issue had been properly preserved for regular appellate review. The *Mackey* instruction posited that the defendant had committed sodomy in two alternate ways—by placing his hand *or* mouth on the victim's genitals. *Id.* at 935. On review, the court cautioned: "To overcome the problem of the jury returning a non-unanimous verdict, disjunctive submissions of acts, especially those which constitute the gravamen of the offense, should be curtailed." *Id.* at 936. Although it found the instruction erroneous, the court found no manifest injustice resulted because:

> There was sufficient evidence presented at trial from which a jury could find that the defendant did commit the two distinct acts constituting deviate sexual intercourse. In addition, the sexual abuse took place simultaneously on a single day i.e. November 4, 1989, and within the time frame when the victim's mother was in the shower and victim's brother was at school. The cumulative effect of this, together with the absence of any

---

12. The State made it clear that its position was that two rapes had occurred; the prosecutor told the jury in opening statement that the Defendant forced himself on Victim in their bed and "had sexual intercourse with her." He went on to state:

> [A]fter having sexual intercourse with her in the bed, [Victim] is going to testify about then getting out of the bed and going to the bathroom and taking a bath. You are also go [sic] to hear testimony that after taking a bath she put her nightgown back on, put her underwear back on. [Defendant] then came into the bathroom and again forced himself upon her. He had sexual intercourse with her on the bathroom counter. That he had a hold of her both in the bed and out on the—in the bathroom.

After the instructions had been read to the jury, but before they retired to deliberate, the prosecutor told the jury in closing argument: Ladies and Gentlemen, he had forcible intercourse with her in the bedroom. And if that wasn't enough he then pursued her into the bathroom later and again had forcible intercourse with her.... He knew he was having sex with her. And he did it twice to her.

The prosecutor mentioned the instruction for attempted forcible rape, but said he was "not going to go through the elements of those, but you can consider those along with Instructions Number 5 and 7." In rebuttal argument, the prosecutor suggested two substantial steps toward forcible rape, as follows:

> Getting on her, pulling her panties down, exposing his penis, telling her I get two weeks of sex, you get the house, shows a substantial step towards forcible rape.

> In the bathroom ripping her underwear off of her or putting her on the counter, ripping her underwear off of her shows a substantial step towards forcible rape.

The State seems to suggest that while it was their position that two rapes had occurred, it was permissible for the jury to reject rape in both occurrences and conclude that the two failed rapes, taken together, constituted but one attempt to rape.

demonstrable prejudice to the defendant, leaves us with a firm belief that there has been no "miscarriage of justice".

*Id.*

In *Fitzpatrick*, the Western District reviewed whether the trial court plainly erred in submitting a verdict director for conspiracy to commit first degree murder that would allow the jury to convict the defendant if it found he agreed to murder a particular police officer *or* another individual. 193 S.W.3d at 291. After acknowledging that a disjunctive submission may be permissible when the alternatives "are in the same 'conceptual groupings[,]' " *Id.* at 292 (quoting *State v. Brigham,* 709 S.W.2d 917, 922 (Mo.App. S.D.1986)), the court ultimately found the disjunctive submission in Fitzpatrick's case erroneous because "[a]lternative victims do not fall into two conceptual groupings." *Id.* at 292. But the error did not result in a manifest injustice because the evidence at trial established that a conspiracy existed to murder both the officer and the other individual. *Id.*

As in *Fitzpatrick* and *Mackey,* there was sufficient evidence before the jury in the instant case to allow it to find that Defendant attempted to forcibly rape Victim both in the bedroom and in the bathroom. The instruction also did not prevent Defendant from defending against both allegations. Defendant is correct in claiming that he "could not know whether any members of the jury would be thinking about his forceful behavior in taking [Victim]'s underwear off, or pulling her closer to him, or any other item of conduct they might seize on as fitting the allegation that he 'tried' " to have sexual intercourse with Victim. But, as earlier noted, Note on Use 4 makes plain that the instruction should not set forth any detailed evidentiary facts, and in this case, a description beyond the location of the offense

would have been unnecessary. Any prejudice Defendant might have suffered was also lessened here by the fact that the events were alleged to have occurred within a relatively short span of time against a single victim and within a single residence. Whether they constituted one incident or two, Defendant's defense was the same— that Victim's testimony could not be believed.

The record reveals that Defendant was in no way restricted in presenting that defense. In his opening statement, defense counsel told the jury it would hear that Victim had made inconsistent statements about what had occurred. Defense counsel maintained that Victim once said that during the first incident in the bedroom, Defendant "made amorous advances and she refused. And that she stopped him from doing anything further and that nothing happened." Defense counsel told the jury that Victim said nothing to the deputy about any rape happening in the bathroom, then told another officer that Defendant attempted to rape her but that the actual rape had happened back in the bedroom after both the first incident in the bedroom and the second incident in the bathroom. Defense counsel told the jury that the State would argue first that the rape happened in the bedroom, then that it happened in the bathroom, then, perhaps, that both events had happened. Defense counsel suggested that the rooms, the statements, and the allegations had changed, and—that while the jury would have to draw its own conclusions from the evidence—defense counsel was allowed to insist that Defendant was innocent of the charges.

Defendant also presented the testimony of a paramedic who had not observed any bleeding or wounds on Defendant when he responded to the 9–1–1 call. Defendant's mother called Victim's motives into question when she testified that Victim told her

well before this incident was alleged to have occurred that Victim wanted the house if anything happened between Defendant and herself. Defendant also presented the testimony of the deputy who prepared the probable cause statement indicating that Victim's statements were confusing.

In closing argument, defense counsel suggested that the break-up of the marriage gave Victim a motive to accuse Defendant and that "the story [had] changed[ ]" and did not match the physical evidence. Defendant objected to the lesser-included instruction at trial on the grounds that there was insufficient evidence to support it, not as a strategy decision to "go-for-broke" in forcing the jury to determine whether a completed forcible rape had occurred. *Cf. State v. Taylor*, 123 S.W.3d 924, 929 (Mo.App. S.D. 2004) (Defendant's objection to a lesser-included instruction on the ground that it was unsupported by evidence instead of as unfairly taking away his "all-or-nothing" defense strategy contributed to a finding of no plain error). Defendant may also have chosen not to raise at trial the complaint he now asserts to this court because the obvious remedy would have been for the State to charge him with an additional count of attempted forcible rape and submit an instruction on each—thereby exposing Defendant to the possibility of an additional conviction and its attendant punishment.

As we find no evident, obvious and clear error that resulted in a manifest injustice or miscarriage of justice, Defendant's point is denied, and the judgment is affirmed.

BARNEY, P.J., and LYNCH, J., Concur.